## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

STEVEN L. COOPER,

        **Plaintiff,**

                                      **Civil Action 2:10-cv-00168**

     **v.**                         **Judge Algenon L. Marbley**

                                      **Magistrate Judge E.A. Preston Deavers**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        **Defendant.**


### REPORT AND RECOMMENDATION

Plaintiff, Steven L. Cooper, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying his application for Social Security Disability Insurance Benefits.

This matter is before the United States Magistrate Judge for a Report and Recommendation on

Plaintiff's Statement of Specific Errors (ECF No. 9) and the Commissioner's Statement of the

Case (ECF No. 10).  For the reasons that follow, the undersigned **RECOMMENDS** that the

Court **OVERRULE** Plaintiff's Statement of Specific Errors and **AFFIRM** the Commissioner of

Social Security's decision.

## I.  BACKGROUND

Plaintiff Cooper maintains that he became disabled on May 20, 2002, at age 47, due to

levorotoscoliosis and degenerative disc disease ("DDD").  (R. at 93.)  On November 29, 2004,

Plaintiff filed his application for disability insurance benefits.  (R. at 202.)  The application was

denied initially and again upon reconsideration.  Plaintiff sought a *de novo* hearing before an

administrative law judge.

On December 5, 2007, Administrative Law Judge Thaddeus J. Armstead, Sr. ("ALJ")

held a hearing at which Plaintiff, represented by a non-attorney representative, appeared and

testified.  Vanessa Harris, a vocational expert ("VE"), also appeared and testified.  On June 11,

2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the

Act.  (R. at 19–28.)  In reaching this conclusion, the ALJ found that Plaintiff retains the ability to

perform light work with various physical restrictions.  (R. at 24.)  On December 22, 2009, the

Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the

Commissioner's final decision.  (R. at 7–9.)

Plaintiff then timely commenced the instant action.

## II.    PLAINTIFF'S TESTIMONY

Plaintiff testified that he was born in 1954, had formal education as a respiratory

therapist, and had experience as a respiratory therapist.  (R. at 354–66.)  At the time of the

hearing, Plaintiff stated that he lived alone, took care of himself, performed chores, played the

guitar, drove, went shopping, took care of his dog, and cooked.  (R. at 355, 362, 365.)

Plaintiff testified that he could not work due to the back pain from his DDD.  (R. at 356.)

He explained that he had worked with pain every day for roughly fourteen years and that his

condition had progressed such that he could no longer tolerate the pain.  (R. at 357.)  Plaintiff

reported that Dr. Gold, who he had seen three times, told him that his scoliosis was the direct

cause of his pain and disc problems.  (R. at 361, 370.)

Plaintiff testified that he could walk about thirty minutes at a time; stand for about a half

hour at a time; and sit for about forty-minutes straight.  (R. at 366, 368.)  He further indicated

2

that he had trouble lifting objects due to back pain.  (R. at 368.)  He stated that he had to lie

down several times a day due to back pain.  (R. at 371.)

### III.    MEDICAL RECORDS

**A.    2000-2001 (Prior to Alleged Onset)**

Prior to Plaintiff's alleged disability onset, in May 2000, Plaintiff had x-rays of his

lumbar spine taken because of back pain.  (R. at 164.)  The radiology report indicated "marked

levorotoscoliosis, with associated degenerative changes secondary to altered weightbearing," and

additional "advanced" degenerative disc change at one level, but with no acute abnormalities.

(*Id*.)

In February 2001, Plaintiff saw his family practitioner, Dr. Steven Howe, with

complaints of back pain that affected his walking "at times."  (R. at 163.)  Dr. Howe diagnosed

Plaintiff with scoliosis.  Plaintiff rated his chronic back pain at about three or four out of ten.

(*Id*.)  He said that his pain medication helped but caused side effects.  (*Id*.)  Dr. Howe prescribed

different pain medication.  (*Id*.)

**C.    2002**

On May 20, 2002, the date of his alleged onset, Plaintiff saw Dr. Howe again with

complaints of back pain.  (*Id*.)  During this visit, Plaintiff requested a medical leave paper from

Dr. Howe and reported that he was going to apply for disability.  (*Id*.)  A May 24, 2002 MRI

showed scoliosis as well as DDD throughout the lumbar spine with mild stenosis at the L3-L4

level, and disc bulge and mild to moderate narrowing of the foramen bilaterally at the L3-L4 and

L5-S1 levels.  (R. at 159, 289.)  In August 2002, Dr. Howe indicated that Plaintiff's diagnoses

were scoliosis and DDD.  (R. at 155–56.)

On July 9, 2002, Plaintiff saw neurosurgeon Dr. Rammy S. Gold with complaints of low back pain radiating into his buttocks.  (R. at 168.)  Upon clinical testing, Plaintiff's low back range of motion was normal, his gait was normal, he had full strength, and his straight leg raise test was negative.  (R. at 168–69.)  Dr. Gold reported that diagnostic films showed "marked" disc degeneration and facet joint disease at the L1 level, with moderate stenosis at the L3 level with "changes secondary to scoliosis."  (R. at 169.)  Dr. Gold opined that Plaintiff's symptoms were "suggestive of recurrent back strain undoubtedly from his scoliotic curve."  (*Id*.)  He recommended a back brace, water therapy, and more imaging, and prohibited Plaintiff from work while he began these treatment measures.  (*Id*.)  Mid-back x-rays and an MRI from later in July 2002 showed scoliosis.  (R. at 166–67.)

In August 2002, in connection with an earlier application for benefits, state agency physician Dr. W. Jerry McCloud opined that Plaintiff could lift twenty-five pounds frequently and fifty pounds occasionally; and sit and stand/walk for about six hours each day out of eight.  (R. at 172–76.)  He did not find any additional limitations.  (*Id*.)  State agency physician Dr. Willa L. Caldwell reviewed and affirmed Dr. McCloud's assessment in November 2002.  (R. at 176.)

In September 2002, Plaintiff reported to Dr. Gold that his water therapy resulted in an overall improvement and that he had no radicular pain.  (R. at 323.)  Dr. Gold opined that Plaintiff was "not suitable for strenuous work or heavy lifting due to his scoliosis," and asked Plaintiff to return on an as needed basis.  (R. at 323.)

**D.**     **2003**

An October 10, 2003 MRI revealed scoliosis with DDD throughout the low-back, with disc bulges ranging from minimal to broad and spinal stenosis ranging from mild to moderate, worse at the L3-L4 level.  (R. at 279–80.)

**E.**     **2004**

On July 9, 2004, Plaintiff went to Dr. Gold's office for the first time since 2002.  (R. at 320–22.)  He did not, however, see Dr. Gold, but instead saw Certified Family Nurse Practitioner Tressa D. Chochran.  (*Id*.)   Plaintiff reported constant aching in his back, but denied radicular symptoms and reported that an EMG/nerve conduction study in 2003 had been negative for lumbosacral radiculopathy.  (R. at 320.)  He also reported that he was able to control his pain with exercise and medication, but that strenuous activity aggravated his symptoms.  (*Id*.)  On examination, Plaintiff's back was tender, but his range of motion was normal, his gait was normal, he could perform various types of walks without difficulty, and he had full strength and no sensory defects.  (R. at 321.)  Nurse Practitioner Cochran explained to Plaintiff that comparison of MRI films from 2003 and 2002 showed no change.  (R. at 322.)  She noted that Plaintiff was inquiring about surgery and disability.  (*Id*.)  She further noted that Plaintiff reported that his pain was tolerable but that he could not return to work without exacerbation of his pain.  (*Id*.)  An x-ray later that month showed scoliosis and moderate disc space narrowing at the L5-S1 level.  (R. at 277.)

On August 24, 2004, after consultation with Dr. Gold, Nurse Cochran reported that, at this time, Dr. Gold did not recommend surgery given that the pain was not yet debilitating.  (R. at 318.)  She explained that "[i]t is unlikely that surgery would allow him to get back to his

previous type of work as a respiratory therapist." (*Id.*)  Nurse Cochran opined that "[t]he pathology in [Plaintiff's] back, as well as his pain does limit his ability to do strenuous type activity." (*Id.*)

On September 7, 2004, after seeing Plaintiff for a follow-up visit, Dr. Gold wrote that Plaintiff had a severe scoliotic deformity which caused severe pain. (R. at 317.)  He did not recommend surgery, but instead advised that Plaintiff should avoid activities that aggravate his pain. (*Id.*)  Dr. Gold indicated that "prolonged sitting, standing and walking" as well as "strenuous activity and heavy lifting" "severely aggravate" Plaintiff's symptoms. (*Id.*)  Finally, Dr. Gold indicated that he "support[s] [Plaintiff's] contention that he is unable to perform his work-related activities," and that he would suggest that Plaintiff again considers applying for disability. (*Id.*)

Plaintiff applied for benefits in November 2004. (R. at 202.)

**F.    2005**

In March 2005, consulting physician Dr. F.A. Humphrey examined Plaintiff in connection with his application for benefits. (R. at 293–98.)  He found that Plaintiff had full range of motion in his back, though with moderate pain; a mildly antalgic gait; and decreased but good strength in his legs. (R. at 294–98.)

Also in March 2005, state agency physician Dr. Sagone, Jr., opined that Plaintiff could: lift twenty pounds occasionally and ten pounds frequently; stand/walk for about two hours out of eight; sit for roughly six hours in a work day; and occasionally engage in postural changes, but never climb ladders, ropes, or scaffolds. (R. at 305–11.)  He further opined that Plaintiff should avoid fumes, dust, and gases due to his breathing problems, including bronchitis. (R. at 311.)

### G.    2006

In April 2006, Plaintiff saw Dr. Gold again for back pain.  (R. at 314.)  He rated his pain level as a three out of ten and reported that he only wore his back brace on occasion.  (*Id*.)  Plaintiff also reported that his symptoms worsened with prolonged activity.  (*Id*.)  On examination, Dr. Gold reported that Plaintiff was "in no obvious discomfort."  (*Id*.)  He indicated that Plaintiff had a slow and antalgic gait, mildly positive straight leg raising on the right, and limited range of motion in his lower back, but full strength, and no sensory defects.  (*Id*.)  Dr. Gold reported that an October 2005 MRI showed a worsening of Plaintiff's scoliosis, spinal stenosis, and foraminal narrowing.  (R. at 315.)  He recommended that Plaintiff "should not sit, stand, or walk for any extended period of time since it exacerbates his pain."  (*Id*.)  He further advised that Plaintiff could wear his brace on an as needed basis and attend physical therapy. (*Id*.)

In June 2006, physical therapist Adrian Moses reported that after five weeks of therapy, Plaintiff had achieved only modest improvement with respect to his low back pain before being discharged.  (R. at 324.)  He noted that Plaintiff was encouraged to continue his exercise program.  (*Id*.)

From June through December 2006, Dr. Howe prescribed Plaintiff pain medication.  (R. at 333.)  On July 18, 2006, Dr. Howe wrote a letter that referenced and parroted Dr. Gold's September 2004 opinion, stating that Plaintiff "is unable to perform his work-related activities." (R. at 326.)

Plaintiff saw physical medicine and rehabilitation specialist Dr. Alex D. Minard in December 2006.  (R. at 341–42.)  Dr. Minard diagnosed chronic low back pain with severe

scoliosis, DDD, and lumbar radiculopathy.  (R. at 342.)  He recommended spinal steroid injections and provided Plaintiff with pain medication.  (*Id*.)

**H.    2007**

In January 2007, Plaintiff underwent steroid injections in his back.  (R. at 338–39.)  He reported six to seven months' worth of "really good relief."  (R. at 343.)

In July 2007, Dr. Minard opined that "due to the severity of [Plaintiff's] scoliosis and his degenerative disk disease . . . [Plaintiff] is totally and permanently disabled."  (R. at 336.)

Plaintiff received injections again in August 2007.  (R. at 343–45.)

Plaintiff's date last insured was December 31, 2007.  (R. at 19.)

## IV.    VOCATIONAL EXPERT TESTIMONY

The VE testified that a hypothetical person with Plaintiff's vocational profile and limited to standing/walking for two hours; sitting for six hours; occasional postural changes and climbing of ramps and stairs, but no repetitive bending and no climbing of ladders, ropes or scaffolds; and no exposure to respiratory irritants, could do work at the light level with about 10,000 jobs available, including labeler, piece checker, garment sorter.  (R. at 375–76.)  The VE indicated that an additional 3,500 sedentary jobs were available, including toy stuffer, addresser, and table worker.  (R. at 376.)  The VE explained that an additional limitation to alternate sit/stand at fifteen minute intervals for five to ten minutes at a time would not change the number of available jobs because of the provision of stools and benches for these jobs.  (*Id*.)  The VE testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") except for the issue of the sit/stand option, which was not identified in the DOT, but was based on the VE's job site analysis.  (R. at 376–77.)

## V.    THE ADMINISTRATIVE DECISION

On June 11, 2008, the ALJ issued his decision.  (R. at 28.)  The ALJ concluded that Plaintiff had the severe impairments of scoliosis and bronchitis.  (R. at 22.)  Next, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (R. at 24.)  He specifically considered the criteria of listings 1.04, 3.02, and 12.04.  (R. at 24.) The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following abilities and/or restrictions:

> [A]n ability to sit a total of about six hours in an eight-hour workday, with normal breaks; stand/walk a total of about two hours in an eight-hour workday, with normal breaks; . . . stand or sit at 15 minute intervals for up to 10 minutes at a time; he is able to climb ramps or stairs occasionally; he can do no climbing of ropes, ladders, or scaffolds; he can occasionally engage in kneeling, crawling, crouching, and stooping; he can do no repetitive bending; and he cannot tolerate exposure to generally obnoxious odors, fumes, dust, gases, and poor ventilation.

(*Id.*)  Considering Plaintiff's age, education, work experience, and RFC, the ALJ further found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  (R. at 27.)  He therefore concluded that Plaintiff had not been disabled under the Social Security Act.  (R. at 28.)

## VI.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).

       Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d

270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence

standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its

own regulations and where that error prejudices a claimant on the merits or deprives the claimant

of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478

F.3d 742, 746 (6th Cir. 2007)).

## VII.   ANALYSIS

       In his Statement of Errors, Plaintiff advances several arguments in support of his

assertion that the decision of the Commissioner denying benefits should be reversed.  First,

Plaintiff asserts that the ALJ erred in failing to find the additional severe impairment of DDD at

step two of the sequential evaluation process.  Second, Plaintiff contends that the ALJ failed to

accord adequate weight to the opinions of his treating physicians.  Finally, Plaintiff maintains that the ALJ erred at step five of the evaluation process in relying on the VE's testimony and in misapplying the grid rules.  This Report and Recommendation addresses each argument separately.

## A.    Additional Severe Impairment

Plaintiff asserts that the ALJ erred in failing to include his DDD as a severe impairment. Because the ALJ found that Plaintiff had at least one severe impairment at step two and proceeded to consider the limiting effects of all of Plaintiff's impairments in his RFC determination, this assignment of error is not well-taken.[1]

---

[1]The Commissioner has established a five-step sequential evaluation process for disability determinations.  20 C.F.R. § 404.1520; *Hensley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009).  Section 404.1520 sets forth the five steps as follows:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 404.1560(b).)

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See paragraph (g) of this section and § 404.1560(c).)

Where the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional capacity." 20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting the claimant's argument that the ALJ erred in finding that a number of her impairments were not severe where the ALJ determined that claimant had at least one severe impairment and considered all of the claimant's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

In the instant case, the ALJ found that Plaintiff had the severe impairments of scoliosis and bronchitis. (R. at 22.) The ALJ then proceeded to the third step of the analysis. Plaintiff concedes that the ALJ explicitly considered his DDD at the third step of the sequence. (Pl.'s Statement of Errors 2, ECF No. 9.); (R. at 22.) Specifically, the ALJ noted that Plaintiff's May 2002 MRI showed evidence of DDD throughout his lumbar spine, with the most prominent findings at the L3-L4 level. (R. at 22.) Although Plaintiff contends generally that the ALJ failed to consider the impact of his DDD, he fails to articulate what limiting effects the ALJ failed to consider. At step four, the ALJ considered the entire record, including Plaintiff's testimony concerning the nature and severity of his back pain, as well as his treating physicians' opinions concerning his limitations attributable to back pain. (R. at 22–26.) Thus, the ALJ's resultant RFC determination accounted for the limiting effects of all of Plaintiff's impairments, both

---

20 C.F.R. § 404.1520(a)(4).

severe and non-severe, including DDD.

Accordingly, the undersigned concludes that the ALJ's failure to include Plaintiff's DDD as a severe impairment is not reversible error.

**B.      Plaintiff's Treating Physicians**

Next, Plaintiff contends that the ALJ erred in failing to accord adequate weight to the opinions of his treating physicians.  He references the opinions of Drs. Gold, Howe, and Minard.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

Even if the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must still meet certain procedural requirements.  *Wilson*, 378 F.3d at 544.  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment
> relationship and the frequency of examination, the nature and extent of the
> treatment relationship, supportability of the opinion, consistency of the opinion
> with the record as a whole, and the specialization of the treating source—in
> determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of

determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20

C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make

clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889,

2010 WL 1725066, at *7 (6th Cir. April 28, 2010) (internal quotation omitted). The United

States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason

requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless
> some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128,
> 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating
> physician rule and permits meaningful review of the ALJ's application of the rule.
> *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v.*

*Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a

claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will

consider opinions of treating physicians "on the nature and severity of your impairment(s),"

14

opinions on issues reserved to the Commissioner are generally not entitled to special

significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

   1.   **Drs. Gold and Howe**

   Given the consistency between the ALJ's findings and the opinions of Drs. Gold and

Howe, as well his assignment of "great weight" to their conclusions, the undersigned rejects

Plaintiff's conclusory assertion that the ALJ failed to accord his treating physicians'

determinations adequate weight.  The ALJ considered Drs. Gold's and Howe's opinions,

assigned them "great weight," and noted that they "are supported to the extent claimant needs to

avoid 'extended' sitting, standing, and walking and avoid 'heavy work.'"  (R. at 26.)  With

regard to Dr. Gold's 2004 opinion, which Dr. Howe subsequently referenced and repeated

verbatim, the ALJ stated that: "[i]t is noted that Dr. Gold supports claimant's contention that he

is unable to perform **his** work related activities (emphasis added), meaning what he encountered

in his work as a respiratory therapist."  (*Id*.)  The ALJ's RFC is entirely consistent with the

opinions of Drs. Gold and Howe, incorporating Plaintiff's ability to stand or sit at 15 minute

intervals for up to 10 minutes at a time, such that Plaintiff is not aggravating his condition due to

prolonged sitting, standing, or walking; limiting him to an exertion level permitting only light

level lifting and jobs that did not require more than two hours total of standing/walking; and

precluding heavy or strenuous work.[2]  Further, the ALJ agreed that Plaintiff, through the date last

insured, was unable to perform his former work related activities as a respiratory therapist.  (*Id*.)

The ALJ explained that "[g]iven his present capacities, [Plaintiff] was unable to meet the

_____

   [2]Notably, the ALJ's RFC is more restrictive than that suggested by the state agency
physicians.  (*See* R. at 26, 172–76, 305–11.)

15

strength demands required in the performance of his past work." (*Id.*)

The undersigned also rejects Plaintiff's contention that the ALJ committed reversible error in neglecting to consult Dr. Gold to clarify what he meant by his use of the phrase "his work related activities" when he indicated in September 2004 that he "support[s] [Plaintiff's] contention that he is unable to perform his work-related activities." (R. at 312.) The ALJ's interpretation that Dr. Gold was referencing Plaintiff's work-related activities in his work as a respiratory therapist is supported by the record. The record demonstrates that Plaintiff had informed Dr. Gold that he had most recently worked as a respiratory therapist. (R. at 318, 322.) Dr. Gold's records contain no reference to other occupations or different work Plaintiff may have performed. For example, in July 2004, after a discussion with Dr. Gold, Nurse Practitioner Cochran dictated a letter to Dr. Howe reporting that Plaintiff "states his pain is tolerable at this level but is unable *to return to work* without exacerbation of pain" (emphasis added). (R. at 322.) Then, just two weeks before Dr. Gold dictated the opinion at issue, Nurse Practitioner Cochran, after a discussion with Dr. Gold, authored a clinical note explicitly stating that "[i]t is unlikely that surgery would allow [Plaintiff] to get back to *his previous type of work as a respiratory therapist*" (emphasis added). (R. at 318.)

Regardless, even if the Court accepts Plaintiff's proposition that Dr. Gold's use of the phrase "his work-related activities" is ambiguous, the undersigned still finds that Social Security Ruling 96-5p's re-contact requirement was neither triggered nor violated. The Sixth Circuit recently explained that Social Security Ruling ("SSR") 96-5p requires adjudicators to consider medical source opinions on any issue, even on those issues that SSR 96-5p recognizes are reserved to the Commissioner. *Ferguson v. Comm'r of Soc. Sec.*, No. 09-4387, 2010 WL

5185848, at *3 (6th Cir. Dec. 23, 2010) (citing SSR 96-5p, 1996 WL 374183, at *2 (July 2,

1996)).  SSR 96-5p provides in pertinent part:

> [A]djudicators must always carefully consider medical source opinions about any
> issue, including opinions about issues that are reserved to the Commissioner. For
> treating sources, the rules also require that we make every reasonable effort to
> recontact such sources for clarification when they provide opinions on issues
> reserved to the Commissioner and the bases for such opinions are not clear to us.

SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).  "The Ruling goes on to identify two

conditions that must both be met to trigger the duty to recontact:  'the evidence does not support

a treating source's opinion . . . *and* the adjudicator cannot ascertain the basis of the opinion from

the record.'"  *Ferguson*, 2010 WL 5185848, at *3 (quoting SSR 96-5p, 1996 WL 374183, at *6).

In this case, even if the Court assumes that the first precondition triggering the ALJ's recontact

requirement is met, the second is not.

As to the second requirement, the bases for Dr. Gold's opinion are clear.  He clearly and

consistently opined that Plaintiff should avoid prolonged sitting, standing, and walking, as well

as strenuous activity and heavy lifting.  (*See* R. at 323, 317, 315.)  Indeed, the ALJ accorded Dr.

Gold's opinions "great weight," incorporating them into his RFC assessment.  *See Ferguson*,

2010 WL 5185848, at *5 (finding that the second precondition triggering SSR 96-5p's recontact

requirement was not met where the bases for the doctor's opinion were sufficient to persuade the

ALJ that the plaintiff suffered from severe impairments); *Poe v. Comm'r of Soc. Sec.*, 342 F.

App'x 149, 156 n. 3 (6th Cir. 2009) ("[A]n ALJ is required to re-contact a treating physician

only when the information received is inadequate to reach a determination on claimant's

disability status . . . .").  Because the bases for Dr. Gold's opinion were clear and unambiguous,

the ALJ's SSR 96-5p duty to recontact Dr. Gold was not triggered.  Thus, the undersigned finds

17

that the ALJ did not abuse his discretion in failing to recontact Dr. Gold.

### 2. Dr. Minard

The ALJ considered Dr. Minard's July 27, 2007 opinion that "due to the severity of [Plaintiff's] scoliosis and denerative disc disease . . . [he] his totally and permanently disabled." (R at 336, 26.)  He rejected Dr. Minard's opinion of disability, explaining that it is inconsistent with his August 3, 2007 assessment that Plaintiff had realized "really good relief" from pain for six to seven months following his first epidural steroid injection.  (R at 343, 26.)  The ALJ further noted that the determination of disability is an issue reserved to the Commissioner.  (R at 26.)  He found that Dr. Minard's opinion was supported only to the extent a severe impairment is established.  (*Id.*)

The undersigned finds that the ALJ did not err in his treatment of Dr. Minard's opinion. First, the undersigned finds Plaintiff's characterization of Dr. Minard as a treating physician unpersuasive.  As set forth above, to qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.   A Court must determine whether or not an ongoing treatment relationship exists at the time the physician's opinion is rendered.  *Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 167 F. App'x 496, 506 (6th Cir. Feb. 9, 2006) ("[T]he relevant inquiry is . . . whether [claimant] had the ongoing relationship with [the physician] *at the time he rendered his opinion*. [V]isits to [the physician] *after* his RFC assessment could not retroactively render him a treating physician at the time of the assessment.").  Generally, the Sixth Circuit has declined to find that an ongoing treatment relationship exists after just two or three examinations.  *See, e.g.*, *Boucher v. Apfel*, No. 99-1906, 2000 WL 1769520, at *9 (6th Cir. Nov. 15, 2000) (finding that a doctor was not a treating source

18

and did not have an ongoing treatment relationship with the claimant even though the doctor had examined claimant three times over a two-year period); *Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimant's] condition."); *Helm v. Comm'r of Soc. Sec.*, No. 5025, 2011 WL 13918, at *3 n.3 (6th Cir. Jan. 4, 2011) (noting that "it is questionable whether a physician who examines a patient only three times over a four-month period is a treating source—as opposed to a nontreating (but examining) source").  In this case, Dr. Minard offered the opinion at issue on July 27, 2007, after examining Plaintiff once in December 2006 and administering epidural steroid injections in January 2007.  Thus, the undersigned finds that Plaintiff did not have the type of ongoing treatment relationship with Dr. Minard that the treating physician doctrine contemplates.

Nevertheless, even if Dr. Minard did qualify as a § 404.1502 treating source, as the ALJ noted, his opinion on disability is not entitled to "any special significance" because it is on a matter reserved to the Commissioner for determination.  20 C.F.R. § 404.1527(e); *Bass*, 499 F.3d at 511.  Moreover, the undersigned finds that the ALJ provided legally sufficient reasons for rejecting Dr. Minard's opinion of disability.  For example, the ALJ correctly noted that Dr. Minard's opinion is inconsistent with his assessment of the relief Plaintiff received from epidural treatment.  *See* 20 C.F.R. § 404.1527(d)(3) (identifying "consistency" with the record as a whole as a relevant consideration).  Additionally, he found that Dr. Minard's opinion was not supported by the record except to the extent a severe impairment is established.  *See* 20 C.F.R. § 404.1527(d)(3) (identifying "supportability" as a relevant consideration).  Thus, the undersigned finds that the ALJ did not commit reversible error with regards to his assessment of Dr. Minard's

opinion.

## C.    Step Five of the Sequential Evaluation Process

Because the ALJ determined that Plaintiff had severe impairments and could no longer

perform the duties of his past work, the ALJ moved on to step five, where "the burden shifts to

the Commissioner to 'identify a significant number of jobs in the economy that accommodate

[Plaintiff's] residual functional capacity . . . .'" *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387,

390 (6th Cir. 2004) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)).

The ALJ concluded that Plaintiff's limitations impeded his ability to perform a full range of light

work.  Consequently, the ALJ consulted a vocational expert to assist him in determining the

extent to which Plaintiff's limitations eroded the unskilled light occupational base.  The VE

testified that there were 10,000 light jobs in the region available given Plaintiff's RFC

limitations.  The VE relied on her knowledge and experience due to the DOT's silence

concerning sit/stand options.  Relying on the VE's testimony concerning the number of jobs

available, the ALJ found that Plaintiff was not disabled during the relevant time period.

### 1.    The ALJ's Reliance on the VE's Testimony

Plaintiff contends that the ALJ erred in relying on the VE's testimony.  He submits that

the VE's testimony that the number of jobs did not lower if Plaintiff's RFC incorporated a

sit/stand option with fifteen-minute intervals is "incomprehensible."  (Pl.'s Statement of Errors

6, ECF No. 9.)  In essence, Plaintiff asserts that he simply does not believe the VE's testimony.

The undersigned finds Plaintiff's contention unavailing.  Plaintiff had an opportunity to

cross-examine the VE during the hearing regarding this testimony, but did not.  In addition,

Plaintiff does not suggest that the ALJ's hypothetical question was inaccurate or otherwise offer

any evidence to challenge the VE's statements beyond declaring his incredulity. This is simply not enough to establish that the ALJ committed error in relying on the VE's testimony. *See Anderson v. Comm'r of Soc. Sec.*, No. 09-6370, 2010 WL 5376877, at *3 (6th Cir. Dec. 22, 2010) ("As long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the claimant is able to perform a significant number of jobs.").

### 2. Application of the Medical Vocational Guidelines

Plaintiff's final assignment of error is that the ALJ incorrectly applied the Medical Vocational Guidelines ("Grid(s)"). He specifically contends that the ALJ should have applied Grid Rule 201.14 to find Plaintiff disabled. The undersigned disagrees.

Plaintiff correctly asserts that at the fifth step, "[a]n ALJ is to employ the grids, found at 20 C.F.R. Part 404, Subpart P, Appendix 2." *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). The Grids provide a series of vocational patterns and direct conclusions of either disabled or not disabled when the facts match the pattern. 20 C.F.R. Part 404, Subpart P, Appendix 2 § 200.00. The Grid Rules are separated into three different tables, applying to people who have the RFC to perform sedentary work, light work, and medium work. 20 C.F.R. 404, Subpt. P, App. 2.

Regulations provide the following definitions for sedentary and light work:

(a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) Light work. Light work involves lifting no more than 20 pounds at a time

> with frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or leg
> controls. To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these
> activities.

20 C.F.R. §§ 404.1567, 416.967. When a claimant's "characteristics do not exactly match the
definition of, for example, light work, his residual functional capacity is used as the proper
framework to determine whether he is disabled." *Templeton v. Comm'r of Soc. Sec.*, 215 F.
App'x 458, 463 (6th Cir. 2007); *Anderson*, 2010 WL 5376877, at *3 ("Where a claimant's RFC
is in between two exertional levels . . . the grid guidelines, which reflect only common—and not
all—patterns of vocational factors, are not binding and are instead used only as an analytical
framework."). Furthermore, if Plaintiff's "exertional level falls between two 'grids' . . . more
difficult judgments are involved as to the sufficiency of the remaining occupational based and
the assistance of a vocational expert is advised." *Templeton*, 215 F. App'x at 463 n.2; *see also*
SSR 83-12, 1983 WL 31253 at * 2 (1983) (Social Security Ruling allowing an adjudicator to
consult a vocational specialist when the RFC does not coincide with one of the work ranges).

Here, the ALJ found, and Plaintiff concedes, that his exertional level fell between two
grids. The ALJ found that Rule 202.14 offered guidance, but acknowledged that Plaintiff's
"ability to perform all or substantially all of the requirements of this work was impeded by
additional limitations." (R. at 27.) Under these circumstances, it was appropriate for the ALJ to
consult the VE "[t]o determine the extent to which these limitations erode the unskilled light
occupational base." (*Id*.); *Templeton*, 215 F. App'x at 463 n.2. Indeed, SSR 83-12 instructs that
"in cases of unusual limitation of ability to sit or stand," as is the case here, "a [vocational

specialist] should be consulted to clarify the implications for the occupational base."  SSR 83-12, 1983 WL 31253 at * 2 (1983).

The undersigned rejects Plaintiff's assertion that the ALJ should have found disability because Plaintiff's exertional capacity is significantly reduced.  Plaintiff correctly notes that SSR 83-12 provides that "if the exertional capacity is significantly reduced in terms of the regularity definition, it *could* indicate little more than the occupational base for the lower rule and *could* justify [a] finding of 'disabled.'"  (*Id.*) (emphasis added).  Thus, though the rule permits such a finding where a claimant's exertional capacity is significantly reduced, it does not require it.  In this case, the VE testified that 10,000 light jobs existed in the region given Plaintiff's RFC limitations.  (R. at 376.)  For purposes of making a disability determination, this number of regional jobs is, as the ALJ found, significant.  *See e.g.*, *Hall v. Bowen*, 837 F.2d 272, 273, 275–76 (6th Cir. 1988) (1,350 jobs is a significant number of jobs in Dayton area and national economy); *Martin v. Comm'r*, 170 F. App'x 369, 375 (6th Cir. 2006) ("870 jobs can constitute a significant number in the geographic region"); *Stewart v. Sullivan*, No. 89-6242, 1990 WL 75248, at *4 (6th Cir. June 6, 1990) (125 jobs in claimant's local geographic area is a significant number).  Thus, contrary to Plaintiff's assertion, the occupational base was not so significantly eroded as to require or suggest a finding of disability.

## VIII.    CONCLUSION

From a review of the record as a whole, the undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, the undersigned **RECOMMENDS** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## IX.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


January 25, 2011                                    /s/ *Elizabeth A. Preston Deavers*
                                                    Elizabeth A. Preston Deavers
                                                    United States Magistrate Judge

24